IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                    CR No. 03-30069-AA

       Plaintiff,                           OPINION AND ORDER

    v.

BUNRIAM MAKHAM,

       Defendant.

———————————————————————

AIKEN, Judge:

    On November 18, 2005, after trial by jury, defendant was
convicted of one count of Accessory after the Fact in violation of
18 U.S.C. § 3, one count of Destroying Evidence in violation of 18
U.S.C. § 1512(c)(1), and one count of Witness Tampering in
violation of 18 U.S.C. § 1512(b)(3). Defendant moves for judgments
of acquittal on all three counts, or in the alternative, for new
trial. Defendant's motions are granted.

1   - OPINION AND ORDER

The court briefly summarizes the evidence adduced at trial.

Defendant is a Thai national who moved to the United States after her marriage to Dave Reynolds. Reynolds was a reputed methamphetamine cook and suspected of manufacturing MDMA, also known as "ecstasy." Despite the fact that they were divorced (apparently to resolve an issue involving title to property in Thailand), defendant and Reynolds continued to live at the same residence located on Williams Highway in Murphy, Oregon. Based on evidence at trial, Reynolds and defendant functioned and were considered as husband and wife.

Reynolds and defendant maintained a nursery, Southern Oregon Botanicals, and a fan import business, Chiang Mai, on adjoining property located at 7515 Williams Highway. Numerous greenhouses and warehouses were located on the property. Reynolds also had a chemical supply business, Chem King, along with a warehouse and an apartment in Grants Pass, Oregon. Prior to moving to Murphy, Reynolds and defendant lived in Fresno, California.

On August 27, 2003, Reynolds was fatally injured in a flash explosion that occurred in a warehouse located at 7515 Williams Highway. Defendant was not home, and Kori Hiser, the daughter of the property's caretaker, drove Reynolds to the hospital in nearby Grants Pass, Oregon. It is not disputed that Reynolds likely was manufacturing methamphetamine at the time of the explosion.

Defendant subsequently arrived home. Kori Hiser told defendant about the fire and of Reynolds' injuries, and the two of them drove to the hospital in Grants Pass. Reynolds was later transferred to the burn unit at Legacy Emanuel Hospital in Portland, Oregon.

After defendant returned home from the hospital that night, she went to the warehouse where the explosion occurred and began cleaning it up. Defendant's sister, Samram Makham Thomas, assisted defendant in cleaning the warehouse area. Defendant and her sister placed broken glass and other debris in bags and boxes and loaded them into a white cargo van. They also attempted to salvage necessary papers for the businesses from an adjacent office area. According to defendant's testimony, she was worried, could not sleep, and wanted to clean up the area so that her "baby" (presumably her youngest daughter) would not get hurt.

On August 28, 2003, defendant called Fred Ladd, a friend and drug associate of Reynolds. She told Ladd about the fire and asked Ladd for help. Ladd drove to Grants Pass with Vanessa Fox, who worked for Reynolds and defendant at the nursery. When they arrived, defendant asked Ladd to take the boxes in the van to Chem King, Reynolds' chemical business in Grants Pass. Instead, Ladd rented a storage unit in Grants Pass, drove the van to the storage unit and unloaded the boxes. While Fox testified that defendant asked Ladd to rent the storage unit, defendant testified that Ladd

3 - OPINION AND ORDER

did so when he could not access Chem King.

Debris from the explosion was loaded on a trailer and eventually taken to the property of Phil Davis, who lived across Williams Highway. Phil Davis and others who helped load the trailer testified that they did so at the request of Rory Hiser, the live-in caretaker and that defendant was not involved.

That same day, August 28, 2003, defendant visited Reynolds in Portland with her sister, two daughters, and Kori Hiser. While in Portland, defendant called Sissie Smith and told her that Reynolds had been injured in a fire. Smith was a long-time friend and drug associate of Reynolds, and Reynolds delivered methamphetamine to her several times a year for Smith to distribute. Although Reynolds sometimes brought defendant on those trips, he would leave defendant at her friend Tipsida's house while he stayed in a motel and went to dinner, shopping, and to the movies with Smith.

Defendant testified that she called Smith because Reynolds was supposed to meet her in Fresno, where Smith lived. Smith testified that defendant called and said Smith needed to come up and see Reynolds.

A few days later, Smith arrived at defendant's residence. Defendant was in Portland at the hospital with Reynolds, so Smith spent the night and drove to Portland the next day. Smith testified that while she was visiting Reynolds in the hospital, she told defendant that there would be an "investigation" because a

chemical burn was different from a fire burn. In response, Smith testified that defendant nodded.

Smith testified that after she and defendant drove back to Grants Pass, she discovered the "real" reason that defendant called her - to help defendant with "this mess."

Although Smith's testimony was not a model of clarity, she testified that on September 6, 2003, she and defendant loaded boxes from the storage unit rented by Fred Ladd into the white cargo van and took them to Chem King. Smith testified that she and defendant also washed glassware at Chem King and loaded up the glassware in boxes, and that defendant asked Smith if she could sell the glassware. While defendant admitted loading up the boxes, she denied helping Smith wash the glassware. Smith testified that she and defendant agreed that Smith should rent a U-Haul to haul the boxes back to Fresno. Defendant testified that it was Smith's idea to rent the U-Haul.

Defendant accompanied Smith to rent a U-Haul in Grants Pass. Smith testified that defendant obtained a key to Reynolds's warehouse from Tony Huckaba, a business associate of Reynolds, to retrieve items from the warehouse. Smith testified that she "assumed" they were getting items from the warehouse because Smith knew Huckaba and Reynolds manufactured methamphetamine there.

Smith testified that she and defendant spoke with Tony Huckaba about driving the U-Haul truck down to California. However,

5   - OPINION AND ORDER

Huckaba did not maintain contact with defendant, and Smith decided to drive the truck herself. Defendant and Samram attempted to persuade Smith to spend the night and leave the next morning, but Smith became anxious and left in the middle of the night.

Early the next morning, on September 7, 2003, Smith was involved in an automobile accident on I-5 near Red Bluff, California while driving the U-Haul truck with her Toyota Camry in tow. After a vehicle driven by Patricia Neese crashed into the Toyota, Smith lost control of the truck and the U-Haul truck rolled on its side in the center median. Smith remarked to the Neese that she was hauling chemicals and could not go back to prison. The CHP soon arrived on the scene, and Smith asked to use Neese's cell phone.

Defendant received a call from Smith at 5:46 a.m., and Smith informed either defendant or defendant's daughter that she had rolled the U-Haul.

Upon questioning, Smith admitted that she had chemicals and glassware used for manufacturing methamphetamine in the truck. After obtaining a search warrant, officers found 168 grams and 12 grams of methamphetamine in separate containers, and 374 grams of pure ecstasy. Officers also located a box with the address of Southern Oregon Botanicals.

DEA Agent Mark Shaver obtained search warrants for Reynolds' properties in Murphy, including Oregon Botanicals, Chem King, and

6    - OPINION AND ORDER

various storage facilities. The search warrants were executed on September 10 and 11, 2003.

Defendant was in Portland with Kori Hiser during the execution of the search warrants. On September 12, 2003, agents contacted defendant at her residence. Government agents contend that defendant denied any knowledge of the fire or cleanup, initially denied knowing Smith, and denied knowing that Smith had rented a U-Haul. Defendant was arrested and advised of her Miranda rights.

On September 14, 2003, defendant was questioned while in the Jackson County Jail. Defendant admitted that she cleaned up the explosion site, she loaded the debris from the explosion in a white van, and that she had called Fred Ladd to help and take the glassware to Reynold's business.

On September 16, 2003, Reynolds died from his injuries.

Defendant was charged in a Superseding Indictment with Accessory After the Fact and Destroying Evidence on or about August 28, 2003, (Counts 1 and 2), Accessory After the Fact and Destroying Evidence on or about September 6, 2003 (Counts 3 and 4), Witness Tampering (Count 5), Distribution of Methamphetamine (Count 6), Distribution of MDMA (Count 7), and Conspiracy to Distribute Methamphetamine (Count 8).

Trial commenced on November 14, 2005. During her testimony, defendant admitted that she cleaned up the so-called lab site the night of the explosion, that she asked Fred Ladd to take boxes from

the lab site the day after the explosion, and that she assisted Sissie Smith in loading glassware and chemicals from Chem King and storage units into a U-Haul. However, defendant denied that she did so with the intent to help Reynolds avoid apprehension for the manufacture of methamphetamine, conceal evidence of a crime, or assist Smith or anyone else in committing or concealing evidence of a crime. Defendant also denies that she told or attempted to persuade Kori Hiser not to speak with law enforcement officers about Reynolds' methamphetamine manufacturing.

On November 18, 2004, after the close of evidence, defendant moved for judgments of acquittal as a matter of law under Federal Rule of Criminal Procedure 29. The court reserved ruling on defendant's Rule 29 motions and the jury deliberated as to all counts.

After several hours of deliberation, the jury returned verdicts of not guilty on Counts 1, 2, 6, 7, and 8 and verdicts of guilty on Counts 3, 4, and 5. Thus, the jury found defendant guilty of Accessory After the Fact and Destroying or Concealing Evidence on or about September 6, 2003, and Witness Tampering on or about September 12, 2003. The court subsequently took defendant's Rule 29 motion under advisement.

On November 25, 2005, defendant moved for new trial pursuant to Federal Rule of Criminal Procedure 33. Pursuant to Rule 29(d)(1), the court considers both motions.

8    - OPINION AND ORDER

## DISCUSSION

At the outset, it is impossible to convey the difficulties associated with this trial because of defendant's limited ability to speak English, her difficulty in understanding English, and her illiteracy in both the English and Thai languages, all of which exacerbated the court's, counsel's, and the jury's difficulty in comprehending defendant's testimony. Defendant's English is heavily accented, with /r/ sounding like /l/, /v/ sounding like /w/, and /s/ sounding like /th/ as some examples, and even when speaking slowly it is difficult to understand her. During her testimony, defendant often mixed her tenses and always used the pronoun "he," even if referring to a woman or more than one person.

Additionally, defendant is a rather unsophisticated individual, having attended school for one day in Thailand and coming to the United States after Reynolds visited Thailand and was introduced to defendant upon telling his driver he was looking for a bride. Uncontested testimony at trial depicted Reynolds to be a controlling, abusive, and secretive man who treated defendant more like a maid than a wife.

Several times during the trial, it was apparent that defendant was confused, either because of the testimony or the proceedings. One of the interpreters interrupted defendant's testimony at least once to inform the court that defendant's testimony and answers to questioning, spoken in Thai, were confusing.

Likewise, the court reporter interrupted defendant's testimony repeatedly, and the court often read back defendant's testimony to help the court reporter, counsel, and the jury understand what defendant had said. At one point, the court reporter, a seasoned professional, stated to the court that she was not confident that she could certify an accurate transcript of the proceedings.

Thus, the tenor of the testimony, along with the demeanor, appearance and credibility of defendant, simply cannot be fully grasped when reduced to words in a transcript.

## A. Motion for Judgments of Acquittal as a Matter of Law

The court must determine whether sufficient evidence supports the jury's guilty verdicts on Counts 3, 4, and 5.

A challenge to the sufficiency of the evidence requires this court to determine whether "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Pearson, 391 F.3d 1072, 1075 (9th Cir. 2004) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). However, "when there is an innocent explanation for a defendant's conduct as well as one that suggests that the defendant was engaged in wrongdoing, the Government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one." United States v. Delgado, 357 F.3d 1061, 1068 (9th Cir. 2004) (citing

## 1. Accessory After the Fact and Destroying Evidence

The jury found defendant guilty of Accessory After the Fact to the crime of Manufacture and Distribution of Methamphetamine on or about September 6, 2003 as charged in Count 3, and Destroying Evidence on or about September 6, 2003 as charged in Count 4. The court discusses these counts together, because they are based on the same conduct of defendant.

Under 18 U.S.C. § 3, a person is an accessory if the person knows a crime has been committed by someone and assists the offender in order to hinder or prevent the offender's arrest. Thus, to be found guilty of Accessory After the Fact as charged in Count 3, the government was required to prove beyond a reasonable doubt that: 1) defendant knew that Dave Reynolds had committed the crime of manufacture and distribution of methamphetamine; and 2) that defendant assisted Dave Reynolds with the intent to hinder or prevent their apprehension or punishment by concealing chemicals and laboratory glassware on or about September 6, 2003.

Under 18 U.S.C. § 1512(c)(1), it is unlawful to "corruptly" alter, destroy, or conceal "a record, document, or other object, with the intent to impair the object's integrity or availability for use in an official proceeding." Thus, to be found guilty of Destroying or Concealing Evidence as charged in Count 4, the government was required to prove beyond a reasonable doubt that: 1)

on or about September 6, 2003, the defendant knowingly and corruptly concealed chemicals and laboratory glassware; and 2) defendant acted with the intent to impair such physical evidence's integrity or availability for use in an official proceeding.

Significantly, the jury acquitted defendant of Accessory After the Fact and Destroying Evidence as charged in Counts 1 and 2. These charges were based on defendant's actions in cleaning the explosion site and removing boxes and glassware from the site on August 28, 2003. It is difficult to reconcile the jury's verdicts on Counts 1 and 2 with their verdicts on Counts 3 and 4, given the evidence presented at trial.

In support of Counts 1 and 2, the government presented evidence that after visiting Reynolds in the hospital with Kori Hiser, defendant returned home and - using headlights from the van - cleaned up the site of the explosion. Rory Hiser, the caretaker for the property, testified that defendant stated that she needed to clean the area because she did not want the police to come, or words to that effect. Rory Hiser also testified that defendant asked him to remove some damaged cabinetry from the warehouse and move it to Davis's property. Finally, Fox testified that defendant called Fred Ladd and asked for his help in moving some boxes from the warehouse to the place of Reynolds chemical business.

The jury necessarily rejected the testimony of Hiser and did not find that her actions in cleaning up the warehouse site or

calling Fred Ladd proved beyond a reasonable doubt that defendant concealed debris from the explosion with the knowledge that Reynolds had committed the crime of methamphetamine manufacturing and with the intent to prevent or hinder his apprehension or arrest. Likewise, the jury necessarily found that the government had not proven beyond a reasonable doubt that defendant acted with the intent to conceal evidence of methamphetamine manufacturing to prevent the use of such evidence in an official proceeding. Given that the evidence in support of Counts 1 and 2 was far more incriminating, the jury's verdicts on Counts 3 and 4 are not justified by the evidence. Regardless, I find the evidence insufficient to establish the necessary criminal intent.

In support of Counts 3 and 4, the government presented evidence that defendant and Sissie Smith loaded a U-Haul truck with glassware and chemicals for transport to Fresno. However, unlike the evidence presented in support of Count 1 and 2, no witness testified that defendant was worried about the police or any investigation. Instead, Smith testified that defendant asked for help "with this mess" and asked Smith to sell the glassware. While Smith testified that she told defendant there might be an "investigation," defendant did not respond and only nodded. Given the admitted communication difficulties between Smith and defendant, such evidence is hardly sufficient evidence to show defendant's intent beyond a reasonable doubt. Indeed, Smith

testified that she simply made "assumptions" as to what defendant was telling her because Smith could not understand her.

Further, Smith testified that it was she, not defendant, who was anxious to leave with the U-Haul, and that defendant tried to convince Smith to spend the night. Kori Hiser testified that defendant expressed no concern about the police or law enforcement authorities after defendant found out that Smith had been in an accident and rolled the U-Haul. Instead, defendant told Kori that she did not know why people kept calling her with their problems. If defendant had sent the glassware and chemical with Smith to conceal them, common sense dictates that she would view Smith's accident as her problem, too. However, the testimony reflects defendant's lack of concern.

Moreover, no witness testified that defendant was concerned that Reynolds would be arrested or detained when she and Smith loaded the U-Haul on September 6, one week after the explosion. There was simply not sufficient evidence presented to show beyond a reasonable doubt that defendant acted with the intent to conceal the chemical and glassware to assist Reynolds in avoiding arrest and apprehension, or to prevent the glassware and chemicals from being used in an official proceeding.

Further, as to Count 3, I find the evidence insufficient to establish beyond a reasonable doubt that defendant knew Reynolds was manufacturing or distributing methamphetamine. No witness

testified that defendant was present when Reynolds manufactured methamphetamine, or that defendant ever saw methamphetamine, knew was it was, or knew that it was an illegal drug. Further, no witness testified that defendant knew Smith and Ladd distributed drugs for Reynolds. Although Smith testified that defendant was present on one or two occasions where Reynolds ordered her to retrieve a package or count money, no mention of drugs or methamphetamine was made, and the drugs were always sealed in a pet food or laundry detergent box. While the totality of the circumstances may have led defendant to believe that Reynolds was involved in illegal activity of some kind associated with chemicals, the evidence does not establish beyond a reasonable doubt that defendant knew Reynolds had committed the crime of manufacturing or distributing methamphetamine.

As to Count 4, the government also failed to establish that a sufficient nexus between defendant's acts of concealing evidence and an official proceeding. Arthur Andersen v. United States, 125 S. Ct. 2129, 2137 (2005). In Arthur, the Securities and Exchange Commission had begun an investigation into alleged accounting improprieties when Arthur Andersen employees were instructed to destroy documents under their document retention plan. Id. at 2133. The Court found the relevant instruction erroneous, because it did not require a nexus between the document destruction and the "official proceeding." "If the defendant lacks the knowledge that

his actions are likely to affect the judicial proceeding . . . he lacks the requisite intent to obstruct." Id.

Here, not only was no official proceeding impending or about to be instituted at the time defendant assisted Smith in loading boxes and chemicals into the U-Haul, no official proceeding was even foreseen. On September 6, 2003, there was no known investigation of the explosion, and no police officers had talked to defendant, her family, or her employees. Thus, no evidence suggests that defendant possessed the knowledge that her actions on September 6, 2003 were likely to affect an official proceeding, and the evidence is thus insufficient to support defendant's conviction on Count 4.

Finally, the court provided an aiding and abetting instruction with regard to Count 4. To prove the defendant guilty of aiding and abetting, the government was required to prove that defendant "knowingly and intentionally aided, counseled, commanded, induced or procured" Sissy Smith to commit the crime of destroying evidence, and that defendant acted with the knowledge and intention of helping Smith commit the crime. For the reasons explained above, I find the evidence insufficient to establish defendant's intent that defendant acted with the intent to assist Smith in committing a crime.

## 2. Witness Tampering

Finally, the jury found defendant guilty of witness tampering

on or about September 12, 2003, as charged in Count 5. As relevant here, 18 U.S.C. § 1512(b)(3) makes it unlawful to "corruptly persuade[] another person . . . with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense."

The evidence presented at trial to support this charge consisted of the following: Kori Hiser testified that defendant repeated to her, "You know nothing," and told Kori to say that she (Kori) "knew nothing." Kori Hiser also testified that defendant stated that Reynolds had told her "they can't prove anything if you don't admit it," or words to that effect.

In the Ninth Circuit, it remains an opens question whether "merely attempting to persuade a witness to withhold cooperation or not to disclose information to law enforcement officials – as opposed to actively lying – falls within the ambit of § 1512(b)." United States v. Sanders, 421 F.3d 1044, 1050 (9th Cir. 2005) (quoting United States v. Khatami, 280 F.3d 907, 913 (9th Cir. 2002)). However, I find persuasive the reasoning of the Third Circuit in United States v. Davis, 183 F.3d 231, 249-50 (3d Cir.), as amended by, 197 F.3d 662 (3d Cir. 1999) and United States v. Farrell, 126 F.3d 484, 488 (3d Cir. 1997). In those cases, the Third Circuit reasoned that "more culpability is required for a statutory violation [under § 1512(b)] than that involved in the act

of attempting to discourage disclosure in order to hinder an investigation." Davis, 183 F.3d at 250 (quoting Farrell, 126 F.3d at 489).

Here, the evidence - when viewed in the light most favorable to the government - showed that defendant said to Kori Hiser, "You know nothing," and to repeat that Kori knew nothing when asked. Even if defendant intended to persuade Kori Hiser to withhold information from law enforcement officers, I find that this evidence does not establish the requisite culpability to sustain defendant's conviction on Count 5 under the reasoning in Davis, F.3d at 250.

Moreover, the evidence presented is insufficient to show beyond a reasonable doubt that defendant attempted to "corruptly persuade" Kori Hiser with the intent to prevent or impede the flow of information to law enforcement officers regarding Reynolds' alleged methamphetamine crimes. In Arthur Andersen, the Supreme Court held that "corruptly" under § 1512 means "knowingly and dishonestly, with the specific intent to subvert or undermine the integrity" of an investigation by federal officers. 125 S. Ct. at 2136. Here, the context of defendant's statement to Kori Hiser was never made clear. Defendant could have been concerned about Kori Hiser's culpability, or, as several people testified, did not want others to know that Reynolds was in the hospital.

In sum, I find that the evidence was insufficient as a matter

18 - OPINION AND ORDER

of law to convict defendant of Accessory After the Fact and Destroying Evidence based on her actions on September 6, 2003, or of Witness Tampering based on defendant's statement to Kori Hiser on or about September 12, 2003.

## B. Motion for New Trial

"A district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal. United States v. Alston, 974 F.2d 1206, 1211 (9th Cir. 1992). "The court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir. 2000).

Thus, "[i]f the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." Kellington, 217 F.3d at 1097 (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)).

Here, even if evidence presented at trial is sufficient, in theory, to support convictions for Accessory After the Fact, Destroying Evidence, and Witness Tampering, I find that the clear weight of the evidence "preponderates" heavily against the verdict

and that a serious miscarriage of justice has occurred.

As explained above, defendant is an unsophisticated person and provided often-confusing testimony, even when speaking in her native Thai language through interpreters. Given the undisputed difficulty that others have in understanding defendant when she speaks English, this court is not confident that any witness's account of her statements, or her intent in making those statements, is accurate. This is not to say that witnesses were untruthful (although Sissie Smith's and Vanessa Fox's testimony was inconsistent and inconclusive). Thus, what defendant said to Kori Hiser, Smith, Fox and others, and her intent underlying those statements, is questionable, at best. This is best exemplified by Smith's testimony that she was proceeding on "assumptions" as to what defendant meant.

Likewise, the court is not confident that defendant's alleged statements to government agents during questioning on September 12 or September 14 are accurate, given that the government did not record her interviews or have an interpreter. Indeed, the reports containing the substance of defendant's questioning did not reflect defendant's "own words" given in response to the agents' questions. The agents' interpretation of defendant's answers indicate a vocabulary and mastery of the English language that defendant simply does not possess. At trial, the agents admitted that defendant does not speak in the matter depicted in the reports, and

that they had some difficulty speaking with and understanding her. After listening to defendant testify for two days, it is difficult to fathom that agents unfamiliar with defendant or the manner in which she speaks were able to understand her answers accurately or ensure that she understood them.

Moreover, the government presented no persuasive evidence that defendant intended to conceal evidence in helping Smith load glassware and chemicals. As explained above, Smith testified that defendant simply wanted her help "with this mess" and that defendant asked her to sell the glassware. No witness testified that defendant was worried about a police investigation or the potential arrest of Reynolds. Further, I do not find credible Smith's testimony that defendant led her around when loading up boxes on September 6. Defendant testified that it was Smith who wanted the chemicals and glassware, and given Smith's long-standing involvement with methamphetamine manufacturing and distribution and her knowledge of Reynolds' operation, it is more likely that Smith knew where Reynolds' chemicals and equipment were and viewed the situation as an opportunity to acquire this equipment to better her own financial lot. This interpretation of the evidence is also consistent with Fox's grand jury testimony, presented at trial, that Smith was "riding" defendant and "pushing" defendant to give Smith "everything."

Finally, without question, Fox and Smith had ample motivation

to provide testimony favorable to the government. While the court recognizes that the government is allowed to, and often must, utilize cooperating witnesses, Fox and Smith were admitted methamphetamine manufacturers or distributers who received decades off of their sentences in exchange for their testimony against defendant. None of the cooperating witnesses, or any other person involved for that matter, was charged with Accessory After the Fact or Destroying Evidence, even though Smith, Fox, her sister Susie, Rory Hiser, and Fred Ladd were directly involved with disposing of evidence from the explosion site and had knowledge or were involved in Reynolds' drug activities.

In further support of her motion for new trial, defendant argues that the jury instructions defining "corrupt" and "corruptly" were inadequate with respect to Counts 4 and 5. For the reasons explained regarding the sufficiency of the evidence, defendant is correct. The court should have provided instructions that "corruptly," as used in § 1512, means "knowingly and dishonestly, with the specific intent to subvert or undermine the integrity of a proceeding," or an investigation by a federal law enforcement officer. <u>Arthur Andersen</u>, 125 S. Ct. at 2136.

Finally, with respect to the destroying evidence charge in Count 4, the court accepted the government's instruction that an official proceeding need not be pending or about to be instituted at the time of the offense, as provided in 18 U.S.C. § 1512(e).

However, in Arthur Andersen, the Supreme Court rejected such as instruction, reasoning that "[i]t is, however, one thing to say that a proceeding 'need not be pending or about to be instituted at the time of the offense,' and quite another to say a proceeding need not even be foreseen." 125 S. Ct. at 2137. Thus, the Court held that § 1512 requires a "'nexus between the obstructive act and the proceeding." Id. (quoting United States v. Aguilar, 515 U.S. 593, 599-600 (1995). The court's instruction did not include a such a "nexus" and therefore was inadequate.

In light of the overwhelming language barriers, defendant's credibility and her lack of sophistication, the obvious self-serving testimony of cooperating witnesses, and the absence of evidence establishing the intent to commit the offenses of conviction, I find that the evidence weighs heavily against the verdicts. Moreover, given that the court provided inadequate instructions regarding the meaning of "corruptly" and the necessary nexus with an official proceeding, a miscarriage of justice would occur if defendant, at a minimum, did not receive a new trial.

## CONCLUSION

In my eighteen years on the bench as a state and federal judge, I have not granted a motion for judgment of acquittal as a matter of law after a jury has returned a verdict of guilty. However, I have also never had a criminal trial or a defendant such as this.

23  - OPINION AND ORDER

For the reasons explained above, defendant's Motion for Judgments of Acquittal as a Matter of Law as to Counts 3, 4, and 5 of the Superseding Indictment is GRANTED. The verdicts of guilty rendered with respect to those counts are HEREBY VACATED. Alternatively and conditionally, defendant's Motion for New Trial (doc. 93) as to Counts 3, 4, and 5 is GRANTED.

IT IS SO ORDERED.

Dated this 23 day of December, 2005.

_____
Ann Aiken
United States District Judge